IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MONIQUE TOLSTON, | **8:16CV176** |
| Plaintiff, | |
| vs. | **MEMORANDUM AND ORDER** |
| CHARLES DREW HEALTH CENTER, Inc., | |
| Defendant. | |

This matter is before the court on the defendant's motion for summary judgment, Filing No. 76.[1]  This is an action for discrimination in employment under the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. § 48-1101 *et seq.*, ("NFEPA").

I.      BACKGROUND

The plaintiff, Monique Tolston, M.D., ("Dr. Tolston") was previously employed by defendant Charles Drew Health Center, Inc. ("CDHC") as a family practice physician. She alleges that CDHC terminated her employment because of her gender and in retaliation for reporting and opposing a violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and subjected her to a retaliatory hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. § 48-1104.  She also asserts state law claims for breach of contract and for a

---

[1] Also pending are the plaintiff's motion and amended motion to extend the deadline to file her brief in opposition to the defendant's motion for summary judgment, Filing No. 108 and Filing No. 110, and CDHC's motion to strike the plaintiff's brief, Filing No. 109, and subsequent withdrawal of that motion. In light of this disposition, those pleadings are moot.

violation of the Nebraska Wage Payment and Collection Act ("NWPCA"), Neb. Rev. Stat. § 48–1228. She alleges the defendant's conduct violates the common law and public policy of the State of Nebraska and she seeks compensatory and punitive damages.

Defendant CDHC moves for summary judgment on all of the plaintiff's claims.[2] It first argues that the plaintiff cannot pursue a claim against CDHC under the EMTALA because CDHC is not a "participating hospital" subject to the requirements of that statute. It next argues that the plaintiff cannot establish a claim for gender discrimination under either Title VII or NFEPA, asserting that Dr. Tolston has not presented a prima facie case in that she cannot show she was meeting CDHC's legitimate expectations during her employment, nor that the circumstances of her termination give rise to any inference of discrimination. Also, CDHC contends the plaintiff cannot rebut its asserted legitimate non-discriminatory reasons for the termination—Dr. Tolston's tardiness, frequent absences, unprofessional conduct, and patient complaints. It also contends that any evidence that other physicians were not disciplined for similar conduct involves employees who were not similarly situated to the plaintiff.

CDHC argues that undisputed evidence shows Dr. Tolston did not engage in any activity protected under federal or state law and cannot show a causal connection

_____

[2] The defendant characterizes the plaintiff's allegations as asserting claims for (1) discrimination on the basis of sex in violation of Title VII of the Civil Rights Act and the Nebraska Fair Employment Practices Act ("NFEPA"); (2) retaliation in violation of the NFEPA and the Emergency Medical Treatment and Active Labor Act ("EMTALA"); (3) hostile work environment in violation of the NFEPA and EMTALA; (4) failure to pay wages due in violation of the Nebraska Wage Payment and Collection Act ("NWPCA"); (5) violation of the public policy of the State of Nebraska; and (6) breach of a written employment agreement. Filing No. 77, CDHC Brief at 9-10. The court does not view the plaintiff's allegations with respect to the EMTALA as a free-standing claim, but it is relevant insofar as it relates to the plaintiff's retaliation claims. Similarly, the court views the ostensible violation of public policy as a component of the retaliation claim under Nebraska law.

2

between any such activity and her termination. CDHC also argues that it is entitled to judgment on the plaintiff's hostile work environment claim because the plaintiff has presented no evidence that she was subjected to unwelcome or offensive conduct that was severe and pervasive. CDHC also contends Dr. Tolston has been fully compensated for her services and cannot establish any NWPCA violation. Further, it argues the plaintiff cannot establish a cause of action for wrongful termination in violation of Nebraska public policy because she has not identified any specific statute or public policy that was allegedly violated. Although it acknowledges the plaintiff has shown a technical, non-material breach of her employment agreement, it argues that her breach-of-contract claim fails because she did not suffer any damages.

II.    FACTS

The facts are gleaned in part from the parties' respective statements of uncontroverted facts and from evidence submitted in connection with the motion. *See* Filing No. 77, CDHC Brief at 3-9; Filing No. 107, Plaintiff's Opposition Brief at 1-47; Filing No. 118, CDHC Reply Brief at 3-21; Filing Nos. 78, 106, and 119, Indices of Evidence. Defendant CDHC is a federally-qualified community health center that is funded mostly by the federal government and is designed to serve the underserved population. The plaintiff, Monique Tolston, M.D., was hired by CDHC in August 2008 as a Family Practice Physician providing general medical and obstetrics ("OB") services. She is a 2005 graduate of the University of Nebraska Medical School, has completed a residency, and is board certified in Family Medicine. As a family medicine doctor, her scope of practice includes "everything from cradle to the grave." Dr. Tolston was granted hospital privileges by Catholic Health Initiatives Immanuel Hospital

("Immanuel") to engage in family practice, including, but not limited to, OB privileges, delivering babies, and caring for infants and mothers post-partum.

The Health Resources and Services Administration ("HRSA") is a government entity that governs and funds community health centers like CDHC. As a government funded health center, CDHC is required to follow rules and regulations promulgated by the Government. CDHC provides services in a clinical setting and is not a hospital. The HRSA requires CDHC to provide a back-up physician for Dr. Tolston who is able to perform the same services as she does. If a clinic does not have a back-up provider on staff, HRSA requires clinics to make arrangements with hospitals to provide the same services as provided by the provider.

Only obstetricians/gynecologists ("OB/GYNs") and Family Medicine doctors with privileges can deliver babies at hospitals. Neither a neurosurgeon, internal medicine physician, nor pediatrician can serve as an on-call for OB patients unless they had hospital privileges and were credentialed to treat OB patients. Internal medicine physicians and pediatricians are not credentialed to provide OB care.

Dr. Tolston was the only OB provider at CDHC for several years. From 2008 through 2010 or 2011, Dr. Tolston took 75 % of all OB on-call and Dr. Esch provided OB on-call one week per month. In 2010 or 2011, Dr. Tolston took all OB on-call for CDHC. In the Fall of 2014, CDHC hired Susan Egbe, M.D. as a Family Practice Physician credentialed to treat obstetrics patients. Dr. Egbe has the same board certifications as the plaintiff, but she did not have OB hospital privileges. Dr. Ochuba testified that Dr. Tolston was upset that Dr. Egbe would be seeing Dr. Tolston's patients.

From August 2008 until June 2015, plaintiff was supervised by Dr. Gregory Ochuba, CDHC's Medical Director. In June, 2015, Dr. Anthony Montegut became CDHC's Chief Medical Officer and Dr. Tolston's supervisor.[3] Dr. Montegut had been employed with CDHC since February 2014 as a part-time physician. He was not involved in any of the staffing issues that took place in late 2014. Dr. Richard L. Brown had served as CDHC's Chief Executive Officer ("CEO") until 2014. He testified he never allowed doctors to be on-call for OB patients unless they were properly licensed and credentialed in OB. In 2014, Kenny D. McMorris replaced Dr. Brown as CEO.

The record shows that on-call OB staffing changes were made in November 2014 as a result of a change in Dr. Tolston's on-call availability. Dr. Ochuba testified that Dr. Tolston decided to stop taking OB calls. Dr. Tolston stated in an email that she was "forced" to give up OB call and to limit her call to 7 days per month. Dr. Ochuba testified that hospital physicians were to have provided OB coverage for the remaining three weeks of each month. He acknowledged, however, that he did not speak to anyone at Immanuel to make sure there was OB coverage during those weeks or to arrange for delivery of patients' charts.

In late November, 2014, Dr. Tolston voiced concerns over CDHC's plans for Dr. Egbe to provide outpatient OB services as a back-up to Dr. Tolston's in-clinic services and its arrangements with hospital staff doctors to treat patients who presented for delivery. Dr. Tolston testified that she told Dr. Ochuba that the policy was unsafe, unethical, provided poor continuity of care, was hazardous and would put fellow

---

[3] The parties agree that the Chief Medical Officer position had the same job duties as the Medical Director position; the job was simply given a new title.

physicians at risk. She testified she also reported her concerns about alleged EMTALA violations to CHDC management, including Dr. Ochuba, Kenneth McMorris, Dr. Egbe, director of nursing Melanie McCroy, and nursing staff, both verbally and in an email dated November 20, 2015. In the email, Dr. Tolston detailed her concerns regarding the changes to OB care, including: (a) failure to provide continuity of care to OB patients; (b) fragmented care that jeopardizes the health and safety of the mother and the baby; (c) lack of medical records of patients at delivery as a critical mistake; (d) the fact that critical changes to the plan were not discussed prior to implementation.

Although it was not mentioned in the email, Dr. Tolston testified she told Dr. Ochuba that it was illegal to use EMTALA to dump CDHC's OB patients and told Dr. Egbe verbally several times about her concerns with violation of EMTALA. Dr. Ochuba disputes that Dr. Tolston discussed possible EMTALA violations at a meeting in December 2014. Kenneth McMorris testified he has no recollection of Dr. Tolston raising any EMTALA concerns. Dr. Ochuba implemented the policy changes despite the plaintiff's concerns. Dr. Tolston also testified she told physicians at Immanuel, including Dr. Adrienne Perfilio, about the changes in policy that Dr. Tolston believed violated EMTALA and would jeopardize patient care.

On December 7, 2014, an incident involving the new policy occurred at Immanuel. There is conflicting testimony about the events that occurred that day, but the incident allegedly involved CDHC's failure to have a doctor on call. At that time Dr. Michael Reed was Chair of the OB Department. Dr. Adrienne Perfilio was Dr. Reed's partner and was employed by Immanuel. Dr. Reed testified Dr. Perfilio told him of an

incident in December of 2014 involving CDHC's failure to provide coverage of an OB patient. He referred to it as a patient dumping situation.

Dr. Tolston testified she believed the incident was a violation of EMTALA because the EMTALA is only supposed to be invoked under certain circumstances. She stated Dr. Perfilio told her the policy was a violation. Dr. Ochuba later called Dr. Tolston and asked her to deliver the baby even though Dr. Tolston contends he had forbidden her to see patients if not on call.

The record shows Dr. Tolston was given a written warning for rudeness and inappropriate behavior on December 10, 2014. The warning ostensibly involved incidents that had occurred on November 20, 2014 and November 25, 2014. An email chain on those dates shows that Dr. Ochuba and Dr. Tolston corresponded about the on-call policy changes. The email chain reflects that Dr. Tolston told Dr. Ochuba she would be taking calls one week per month pursuant to her contract. Dr. Ochuba took away Dr. Tolston's additional week of vacation to reflect the change. Dr. Tolston responded outlining her concerns and later copied others in on the email. Dr. Ochuba contends she was reprimanded in part for copying in her CEO and her office manager on her complaint email.

Dr. Ochuba stated on the employee warning notice:

> On November 25, 2014 you sent out misstatement emails on the CDHC OB program to the Medical Director, the CEO, and the Clinic Coordinator including another CDHC provider. That discussion was held between you and the Medical Director and should not have included others. The information that was emailed was inaccurate.

Filing No. 78-2. The warning further stated: "You are to comply with your immediate manager regarding legitimate work related directives and accept proper work-related

decisions from your immediate manager." *Id.* Dr. Tolston indicated on the form that she did not agree with the recitation of events that precipitated the warning. *Id.*

Dr. Tolston testified she was subjected to continual retaliation from November 2014 through the date of her termination. She testified she was subjected to angry, dismissive treatment by Dr. Ochuba, Dr. Montegut and Mr. McMorris. She stated she was ignored, received lower ratings in several areas on her evaluation, and was issued disciplinary write ups. She also testified that after late 2014, she felt she was being watched and targeted. There is evidence that McMorris asked the Director of Nursing to document concerns with respect to Dr. Tolston. Dr. Tolston also testified she was excluded from clinic meetings after she expressed concerns about the policy.

The record shows that Dr. Tolston was disciplined several times after the November 2014 written warning. In June 2015, a patient filed a complaint against her, claiming that Dr. Tolston failed to provide proper care. The patient requested a refund and asked to be transferred to a different physician. On August 7, 2015, another patient made a complaint against Dr. Tolston. That patient stated that Dr. Tolston had refused to see her when she arrived at CDHC on August 4, 2015, and required the patient to schedule a different appointment. The patient reported that she overheard Dr. Tolston state that she did not want to see the patient. The patient requested her records so that she could seek treatment from physicians not affiliated with Defendant. Melanie McCroy, the CDHC Director of Nursing, and Dr. Montegut met with the patient and discussed her complaint on August 7, 2015. Dr. Montegut took over the patient's treatment.

Dr. Tolston was terminated on August 7, 2015. Kenny McMorris testified that the decision to terminate Dr. Tolston was based on Dr. Tolston's behavior on August 7, 2015, when she refused to see a patient. He conceded, however, that refusal to see a patient would not be sufficient grounds to terminate a physician. CDHC concedes that Dr. Montegut told the plaintiff that it was McMorris's decision to fire her, although that fact was not true. McMorris testified the decision to terminate Dr. Tolston was made by Dr. Montegut. Although Dr. Ochuba, who continued to be employed by CDHC as an internal medicine physician after Dr. Montegut was appointed Medical Director, testified that he did not share information regarding physicians he had disciplined in the past with Dr. Montegut, there is evidence that Dr. Montegut has access to that information.

McMorris testified that the values of CDHC do not include rude behavior, disrespectful behavior, and treating a patient with less than dignity and respect. He also stated the termination decision was based on a pattern of activity by Dr. Tolston and her behavior overall, including her performance in terms of not showing up on time, not following protocol in relation to calling and staying in contact with the appropriate supervisor when necessary, failing to attend meetings, and "erratic behavior." McMorris also testified, however that Dr. Tolston generally met most clinical performance goals and conceded that a male doctor who did not meet performance goals was not terminated.

Dr. Montegut testified that his decision to terminate Dr. Tolston was based on her absences, tardiness, unprofessional behavior, disruptions to the clinic, and unprofessional interactions with Drs. Ochuba and Egbe. He also testified that one of

the troubling issues was Dr. Tolston's interactions involving Dr. Egbe providing OB coverage.

Anita McGaugh, former CDHC Director of Human Resources, testified that CDHC had a progressive discipline policy, consisting of a verbal warning, written warning suspension and termination. There is evidence that patient complaints were made against numerous doctors as well as evidence that several doctors failed to maintain charts in a timely manner. There is little documentary evidence with respect to Dr. Tolston's and other physicians' absences or tardiness. Dr. Brown testified that Dr. Tolston was granted leniency with respect to punctuality and attendance because she was often up at night delivering babies. The record shows no doctors other than Dr. Tolston were terminated, and Ms. McGaugh knew of no other physicians who were terminated immediately after a patient complaint. Another woman physician resigned under threat of termination. No other CDHC physicians had opposed something they believed was in violation of state or federal law. Dr. Montegut testified the other people terminated immediately without progressive discipline were terminated for falsifying a timesheet and for stealing.

Dr. Tolston's employment was governed by a Professional Employment Agreement ("contract"), although the parties dispute whether the contract was in force at the time of Dr. Tolston's termination. The record shows Dr. Tolston once tendered her resignation. She testified that Dr. Brown told her the contract would continue in force. Under the contract, Dr. Tolston was required to comply with all of CDHC's rules, policies, and procedures, to provide patient care, and to provide call coverage for CDHC providers. The parties agree that the contract requires ninety days' notice, in writing, to

terminate the Agreement without cause.  The Agreement could also be terminated due to a material breach on thirty days written notice.  The contract also provides:

> Discharge.  Notwithstanding any other provision in this Agreement to the contrary, Employer may, at its election, terminate this Agreement by delivering written notice thereof to Physician upon, or at any time after, Employer determines, in the exercise of its reasonable discretion, and upon receipt of reasonable proof, that Physician shall be guilty of self-dealing or dishonesty, or shall have been convicted of a felony or a misdemeanor materially and adversely affecting Physician's performance of Duties hereunder, or shall have engaged in illegal or other wrongful conduct detrimental to the business and reputation of Employer, which termination shall be effective immediately upon delivery of such written notice.

Filing No. 106-10.

There is no dispute that the first written notice to terminate the contact was given to plaintiff on or about September 3, 2015.  Plaintiff was fully compensated for all work performed for CDHC through August 7, 2015.  During her employment, plaintiff never complained that Dr. Montegut treated her differently because of her gender.

III.    LAW

A.    Summary Judgment Standards

Summary judgment should be granted when—viewing the facts most favorably to the nonmoving party and giving that party the benefit of all reasonable inferences—the record shows that there is no genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*).   An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court should deny summary judgment if there is sufficient evidence for a jury to return a verdict for the non-moving party.  *Fercello v. County of Ramsey*, 612

F.3d 1069, 1077 (8th Cir. 2010). The substantive law will determine which facts are material. *Id.*

Courts must "adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the non[-]movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. —, —, 134 S. Ct. 1861, 1863 (2014) (per curiam) (quoting *Anderson,* 477 U.S. at 255). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial. *Tolan*, 572 U.S. at —, 134 S. Ct. at 1866 (internal marks omitted) (quoting *Anderson,* 477 U.S. at 249). "A jury—not a district or appellate judge—must resolve any genuine factual disputes underpinning a legal question." *Davis v. Ricketts*, 765 F.3d 823, (8th Cir. 2014) (Riley, J., concurring in part and dissenting in part).

B.    Gender Discrimination

Under federal law, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To survive a motion for summary judgment in a Title VII claim, the plaintiff must show either direct evidence of a Title VII violation or create an inference of discrimination or retaliation under the burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *See Fiero v CSG Sys. Inc.*, 759 F.3d 874, 878 (8th Cir. 2014). The NFEPA mirrors the language of Title VII, prohibiting employers from discriminating against employees on the basis of sex. *See* Neb. Rev. Stat. § 48-1104. The same standards

applied in Title VII cases apply to causes of action for sex based discrimination brought pursuant to the NFEPA. *See Helvering v. Union Pac. R.R.*, 703 N.W.2d 134 (Neb. App. 2005).

Direct evidence of discrimination requires "a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003). Absent proof of direct evidence of discriminatory motive, a discrimination action is analyzed under the *McDonnell Douglas* burden-shifting framework, and the claim proceeds in three stages. *See Jackson v. United Parcel Service, Inc.*, 643 F.3d 1081, 1086 (8th Cir. 2011); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

First, the plaintiff must establish a prima facie case of discrimination. *Id.* at 802; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). The plaintiff's burden at the prima facie stage is not great; the plaintiff is required to present facts capable of supporting an inference of discrimination. *Torgerson*, 643 F.3d at 1047 (*en banc*). To establish a prima facie case of gender discrimination, the plaintiff must show: (1) she is a member of a protected class, (2) she met the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 974 (8th Cir. 2012). "'The required prima facie showing is a flexible evidentiary standard,' and a plaintiff can satisfy the fourth part of the prima facie case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." *Id.* (quoting *Pye v. Nu Aire,*

*Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011)); *see, e.g., Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) (stating that a classic demonstration evidence that creates an inference of unlawful discrimination is showing that similarly-situated employees were treated in a disparate manner).

At stage two of the three-stage burden-shifting framework, the defendant may rebut the prima facie case by articulating a non-discriminatory rationale for its action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). A defendant may meet this burden by offering admissible evidence sufficient for the trier of fact to conclude that petitioner was fired because of a reason other than discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Id.* (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 509).

At the third stage, the plaintiff must prove that the defendant's proffered rationale was merely a pretext for discrimination. *Reeves,* 530 U.S. at 143 (stating that once the defendant meets its burden, the *McDonnell Douglas* framework—with its presumptions and burdens—disappears and the sole remaining issue is "discrimination *vel non.*") The plaintiff's "burden to show pretext 'merges with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination.'" *Torgerson*, 643 F.3d at 1046 (quoting *Burdine*, 450 U.S. at 256).

A plaintiff seeking to survive an employer's motion for summary judgment must therefore show there is a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination. *Fatemi v. White*, 775 F.3d 1022, 1045 (8th

Cir. 2015). The plaintiff may establish that she "was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 256). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* at 147. "Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact." *Torgerson*, 643 F.3d at 1046. In other words, the question is whether a "prohibited reason, rather than the proffered reason, actually motivated the employer's action." *Barber v. C1 Truck Driver Training, LLC,* 656 F.3d 782, 792 (8th Cir. 2011). Evidence "of 'shifting explanations' [for an adverse action may] give rise to an inference of pretext." *Fatemi,* 775 F.3d at 1047.

C.      Hostile Work Environment

"Hostile work environment harassment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 805 (8th Cir. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citation omitted)). To survive a motion for summary judgment on a claim of hostile work environment under Title VII, the plaintiff must show that (1) he or she is a member of a protected group; (2) he or she was subject to unwelcome gender-based harassment; that (3) there was a causal nexus between the harassment and the membership in the protected group; and that (4) the harassment affected a

term, condition, or privilege of employment.  *Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011).

In order to find that the harassment affected a term, condition or privilege of employment, a plaintiff must be able to establish that the conduct was extreme, such that intimidation and ridicule permeated the workplace.  *Jackman*, 728 F.3d at 806; *see Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 634 (8th Cir. 2016) (stating that to survive summary judgment, a plaintiff must present evidence from which a reasonable jury could conclude that the harassment was sufficiently "severe or pervasive" to affect a term, condition, or privilege of the plaintiff's employment).   The standard for demonstrating a hostile work environment under Title VII is "demanding," and "does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace."  *Jackman*, 728 F.3d at 806 (quoting *Wilkie v. Dep't of Health and Human Servs.*, 638 F.3d 944, 953 (8th Cir. 2011)).

"Relevant factors for determining whether conduct rises to the level of harassment include the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.'"  *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011) (quoting *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005).  The court considers the conduct both "as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim."  *Malone,* 646 F.3d at 517.

A hostile environment caused by a factor other than a prohibited criterion is not actionable.  *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008) (holding

the plaintiff must prove that she was the target of harassment because of her sex); *see also Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007) (stating that if "the charge is the creation of a working environment hostile to women, the conduct must be the kind that makes the workplace uncomfortable for women, as distinct from making it uncomfortable for cat lovers, for people who are disgusted by coworkers who violate work rules by selling Avon products at work, for people offended by adultery, for gamblers, and for fastidious people, who abhor foul language").  If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of discrimination as a result of that environment.  *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir. 1998).

      D.      Retaliation under Title VII

      Federal law makes it unlawful for an employer to discriminate against its employee on the basis of the employee's opposition to an unlawful employment practice.  *See* 42 U.S.C. § 2000e-3(a) (2012).  A plaintiff may establish a retaliation or reprisal claim through direct or indirect evidence.  *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 818 (8th Cir. 2017).  Where the plaintiff relies on indirect evidence, the *McDonnell Douglas* burden-shifting analysis applies.  *Id.*  Thus, the plaintiff "bears the burden of first establishing a prima facie case of retaliation by showing that '(1) she engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct.'"  *Id.* (quoting *Musolf v. J.C. Penney Co.*, 773 F.3d 916, 918 (8th Cir. 2014)).

To establish a retaliation claim under Title VII, the employee must attribute the employer's conduct to an employment practice "made unlawful by Title VII." *Hunt v. Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002). The employee must show that the alleged adverse action was in retaliation for opposing conduct that involved gender discrimination. *Id.*; *see Zanders v. U.S. Bank*, No. 4:13–cv–00481–SMR–HCA, 2016 WL 8925395, at *21 (S.D. Iowa Jan. 14, 2016), *aff'd*, 674 F. App'x 591 (8th Cir. 2017), *cert. denied*, No. 16-9454, 2017 WL 2483398 (U.S. Nov. 13, 2017).

Activities protected from retaliation under Title VII are opposing any unlawful employment practice made unlawful by Title VII, making a charge of discrimination, or testifying, assisting, or participating in an investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3. The "text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, ––– U.S. ––––, 133 S. Ct. 2517, 2534 (2013). It is not enough that retaliation was a "substantial" or "motivating" factor in the employer's decision. *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016).

E.    Retaliation under NFEPA

Nebraska law also makes it unlawful for an employer to discriminate against its employee on the basis of the employee's opposition to an unlawful employment practice. Neb. Rev. Stat. § 48-1114; *Oldfield v. Nebraska Mach. Co.*, 894 N.W.2d 278, 295 (Neb. 2017). Under Nebraska law, the right of an employer to terminate employees at-will is restricted only by exceptions created by statutes or those instances where courts find that a very clear mandate of public policy has been violated. *Ambroz v.*

*Cornhusker Square Limited*, 416 N.W.2d 510, 515 (Neb. 1987); *Wendeln v. The Beatrice Manor, Inc.*, 712 N.W.2d 226, 238 (Neb. 2006). A "tort-based claim for retaliation when it violates public policy," is cognizable. *Knapp v. Ruser*, 901 N.W.2d 31, 49 (Neb. 2017); *see Trosper v. Bag 'N Save*, 734 N.W.2d 704, 707 (Neb. 2007) (holding that generally, an employer may terminate the employment of an at-will employee at any time, but there is a public policy exception to the at-will employment doctrine). The Nebraska Supreme Court describes the exception as follows:

> Under the public policy exception, we will allow an employee to claim damages for wrongful discharge when the motivation for the firing contravenes public policy. The public policy exception is restricted to cases when a clear mandate of public policy has been violated, and it should be limited to manageable and clear standards. In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme.

*Knapp,* 901 N.W.2d at 49 (quoting *Trosper,* 734 N.W.2d at 707). The exception has been limited to claims of retaliatory discharge and retaliatory demotion. *Knapp,* 901 N.W.2d at 49.

In Nebraska, employees are protected under the NFEPA "'from employer retaliation for his or her opposition to an act of the employer only when the employee reasonably and in good faith believes the act to be unlawful.'" *Oldfield,* 894 N.W.2d at 294 (quoting *Wolfe v. Becton Dickinson & Co.*, 662 N.W.2d 599, 605 (Neb. 2003)). In order for such a belief to be reasonable, the act believed to be unlawful must either in fact be unlawful or at least be of a type that is unlawful. *Wolfe*, 662 N.W.2d at 605. To establish a prima facie case of unlawful retaliation under the NFEPA, an employee must show (1) that he or she participated in a protected activity, (2) that the employer took an

adverse employment action against him or her, and (3) that a causal connection existed between the protected activity and the adverse employment action. *O'Brien v. Bellevue Pub. Sch.*, 856 N.W.2d 731, 741 (Neb. 2014).

With respect to a causal connection, "because an employer is not apt to announce retaliation as its motive, an employee's prima facie case is ordinarily proved by circumstantial evidence." *Id.* Proximity in time between the protected activity and discharge is a typical beginning point for proof of a causal connection. *Id.* at 742. "Generally, however, 'more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.'" *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (*en banc*)). Evidence that tends to support an inference that the employer's proffered reason for the employee's termination was pretextual, together with knowledge of the protected activity by those making the decision on termination, failure to adhere to established company policies, and discriminatory treatment in comparison to similarly situated employees, are sufficient to establish a causal link between an employee's termination and the protected act. *See Riesen v. Irwin Indus. Tool Co.*, 717 N.W.2d 907, 916 (Neb. 2006).

F.    Breach of Contract

Under Nebraska law, to create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Linscott v. Shasteen*, 847 N.W.2d 283, 289 (Neb. 2014). In order to recover in an action for breach of contract, the plaintiff must prove the existence of a promise, its breach, damage, and compliance with any

conditions precedent that activate the defendant's duty. *Henriksen v. Gleason*, 643 N.W.2d 652, 658 (Neb. 2002). The ultimate objective of a damages award in a breach of contract case is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole. *Aon Consulting v. Midlands Fin. Benefits*, 748 N.W.2d 626, 655 (Neb. 2008). One injured by a breach of contract is entitled to recover all its damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach. *Id.* While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Id.* The proof is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness. *Shipler v. Gen. Motors Corp.*, 710 N.W.2d 807, 839 (Neb. 2006). The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Dutton–Lainson Co. v. Continental Ins. Co.*, 778 N.W.2d 433, 450 (Neb. 2010).

G.      Nebraska Wage Payment and Collection Act

The NWPCA provides a cause of action for employees to recover unpaid wages. Neb. Rev. Stat. § 48-1231(1). To establish a claim for unpaid wages under the NWPCA, an employee must demonstrate that the claimed payment: (1) is compensation for labor or services; (2) was previously agreed to by the employer; and (3) all of the conditions stipulated between the employee and the employer as to the claimed payment have been met. *See Knutson v. Snyder Industries, Inc.*, 231 Neb.

374, 436 N.W.2d 496 (1989). "The Nebraska Wage Payment and Collection Act defines wages as 'compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis.'" *Sindelar v. Canada Transp., Inc.*, 520 N.W.2d 203, 209 (Neb. 1994) (quoting Neb. Rev. Stat. § 48–1229(3)(holding that deferred compensation constitutes wages under the Act). In other words, the NWCPA permits an employee to recover wages an employer previously agreed to pay. *Baouch v. Werner Enterprises, Inc.,* 244 F. Supp. 3d 980, 1003 (D. Neb. 2017); *see Eikmeier v. City of Omaha*, 280 Neb. 173, 783 N.W.2d 795, 798 (2010).

Awards under long-term incentive plans are compensation under the NWPCA. *Schaffart v. ONEOK, Inc.*, 686 F.3d 461, 476 (8th Cir. 2012); *see Brockley v. Lozier Corp.*, 488 N.W.2d 556, 567 (Neb. 1992). Severance benefits are not. *Shaffart*, 686 F.3d at 475-76 (noting contractual incentive payments are provided to attract new employees, retain current employees, and motivate and reward high performers and are distinguishable from severance benefits because the payments are not based on ceasing to work); *see Eikmeier*, 783 N.W.2d at 799. Also, "overtime wages can be claimed under the act only if those overtime wages were previously agreed to by the employer and the employee." *Freeman v. Central States Health and Life Co. of Omaha*, 515 N.W.2d 131, 135 (Neb. App. 1994).

IV.    DISCUSSION

The court first finds that the defendant's motion for summary judgment should be denied with respect to the plaintiff's claim that her termination was discriminatory. The

record shows there are genuine issues of material fact with respect to gender discrimination.

The court first rejects the defendant's contention that the plaintiff has not shown she was qualified for the position. She was clearly qualified for purposes of establishing a prima facie case—she was an M.D., had hospital privileges, and had worked at the clinic for over seven years. Whether she was meeting the defendant's legitimate expectations during her employment relates to the ultimate issue of whether the asserted rationale for her termination was in fact a pretext for discrimination.

Further, the court finds there is evidence in the record sufficient to create an inference of discrimination. Viewed in the light most favorable to the plaintiff, evidence in the record could lead a jury to find the defendant's proffered explanation for Dr. Tolsten's termination is less than credible. CDHC contends that the plaintiff was fired for unprofessional conduct, tardiness and absences. However, CDHC representatives expressed conflicting grounds for the termination and admittedly misled Dr. Tolston as to the identity of the decision-maker. There is also evidence that male physicians were disciplined less harshly, or not at all, for similar behavior. Also, the only physicians that were fired, or threatened with termination, were women. Further, CDHC did not follow its progressive discipline procedures in Dr. Tolston's case. The court finds the combination of these facts is sufficient at this time to create an inference of discrimination. There are issues of fact on these issues that will require assessments of credibility.

The court finds that the plaintiff has presented some evidence probative of intentional discrimination. Whether that evidence is persuasive on the issue of pretext

and sufficient to show that the termination was gender discrimination is a question for the jury. CDHC concedes that there are numerous factual disputes, but contends any such disputes are irrelevant. To the contrary, the court finds there are disputes on the issues of motivation, credibility, timing, and intent. The plaintiff challenges the defendant's version of events and has shown that there is a factual dispute on the reasons that underlie her termination. Although the reasons for her dismissal may well prove to be disciplinary, at this stage of the case the court cannot weigh the evidence and make that determination. Viewing the evidence in the light most favorable to Dr. Tolston, a reasonable juror could find the CDHC's actions in terminating Dr. Tolston were discriminatory. Accordingly, the defendant has not shown it is entitled to summary judgment on the plaintiff's claim that CDHC violated Title VII and the NFEPA in terminating her employment.

However, with respect to Dr. Tolston's Title VII and NFEPA claims that are based on the contention that she was subjected to a hostile working environment, the court finds the plaintiff has not presented evidence of conduct so severe and pervasive that it would alter the terms and conditions of her employment. There is some evidence that Dr. Tolston was subjected to unwelcome condescending or demeaning treatment that could be characterized as a form of harassment. Evidence that Dr. Tolston was slighted, ignored, or treated dismissively by CDHC physicians simply does not rise to the level of an abusive working environment. Even if the statements were made in the context of the plaintiff having been singled out for disciplinary action, the court finds the comments simply do not rise to the level of conduct severe enough to be objectively perceived as creating an intolerable workplace. The comments were relatively

infrequent, were not particularly severe or offensive, and were not especially humiliating or demeaning.

Even if the plaintiff could show the defendant's conduct was severe and pervasive, she must also show that she was singled out because of her gender or in retaliation for her reporting of gender-based perceived illegal activity. The court finds the plaintiff has not established the connection between any hostile or harassing acts and her gender. The timing suggests, if anything, that the alleged hostile actions were due to the plaintiff's opposition to ostensible EMTALA violations, rather than to any gender-based discriminatory animus. In response to the defendant's motion, Dr. Tolston has not produced any evidence on which the jury could conceivably find in her favor. Accordingly, the court finds the defendant has established that it is entitled to judgment as a matter of law on the plaintiff's hostile environment claim. Though not viable as a free-standing claim, evidence of the defendant's allegedly hostile behavior remains relevant to show gender bias or retaliation.

The court also finds that undisputed evidence shows, as a matter of law, that Dr. Tolston cannot maintain a claim under Title VII for retaliation. Defendant argues that plaintiff cannot show she opposed or participated in any statutorily defined activity under Title VII. The court agrees that the plaintiff has not shown she was retaliated against for exercising rights protected by Title VII. There appears to be no dispute that the activity for which the defendant is alleged to have retaliated against her was her opposition to a policy that arguably violated the EMTALA. Because the plaintiff's complaints about the on-call policy did not relate to gender but to assertions that the new policy was unethical, unwise, and possibly illegal as a violation of EMTALA, Dr. Tolston's protests

were not statutorily protected activity under Title VII, and she thus cannot establish a prima facie case of retaliation under Title VII. Because Dr. Tolston has not shown she engaged in an activity protected under Title VII, the defendant's motion for summary judgment on that claim should be granted. Further, it appears that Dr. Tolston would be unable to prove that any retaliation for Title VII protected activities was the but-for cause of her termination. Accordingly the court finds the defendant's motion of summary judgment on the plaintiff's claim of retaliation under Title VII should be granted.

Such is not the case, however, with respect to the retaliation claim the plaintiff brings under state law. Nebraska law protects her from retaliation for whistle-blower-type activity. Dr. Tolston has presented evidence that raises a genuine issue of material fact on whether she was fired in retaliation for reporting or opposing a perceived violation of federal law. Though the evidence supporting the element of causation is thin in view of the length of time between the complaints of an EMTALA violation and her termination, the fact that the written warning for rudeness and inappropriate behavior in late 2014 closely followed the alleged EMTALA violation incident at Immanuel and triggered alleged targeting of Dr. Tolston may be sufficient to persuade a reasonable jury to return a verdict for Dr. Tolston on the claim.

The court further finds that the defendant's motion for summary judgment should be denied with respect to the plaintiff's breach of contract claim. First, there is a genuine dispute on whether the contract remained in place. Next, the defendant's motion is based on the contention that the plaintiff cannot show she suffered any damages as a result of any breach. That argument depends on a determination of whether the conduct that triggered Dr. Tolston's termination furnished the grounds for

immediate termination under the contract—wrongful conduct detrimental to CDHC's business and reputation. If not, the contract required ninety days' written notice for a termination without cause, or thirty days' written notice for a material breach other than such "wrongful conduct." Tolston has presented evidence that shows there is a genuine issue of material fact on the reasons for her termination. CDHC admits that written notice was not provided to Dr. Tolston until approximately one month after her termination. Whether the contract was breached would depend on a jury's determination of the reason or reasons for her termination. Whether CDHC's admitted failure to provide notice in writing for thirty days is a material breach is also a question for the jury. Depending on the evidence, Dr. Tolston may be able to show she is entitled to damages in the amount of her salary for either thirty or ninety days. Accordingly, the court finds the defendant's motion for summary judgment should be denied.

Similarly, the court finds the defendant's motion for summary judgment on the NWCPA claim should be denied. The defendant's motion is based on its contention that Dr. Tolston admittedly has been fully compensated for all labor and services she performed for CDHC prior to her termination. Dr. Tolston contends however, that she suffered monetary damages compensable under the NWPCA for wages due her during the notice period as provided in the employment contract. She also contends she is due compensation for certain required Continuing Medical Education days.

Dr. Tolston's NWPCA claim for unpaid wages is dependent on what the employer previously agreed to pay, which is in turn dependent on the reason for Dr. Tolston's termination. There are genuine issues of material fact on the existence of the

employment contract, the terms of the employment contract, the reasons for Dr. Tolston's termination, and the timing of the allegedly requisite notice. Accordingly, the court finds the defendant's motion for summary judgment should be denied with respect to the plaintiff's NWPCA claim.

IT IS ORDERED that:

1.    Defendant's motion for summary judgment ([Filing No. 76](#)) is granted with respect to the plaintiff's hostile work environment claim and her claim for retaliation under Title VII and denied in all other respects.

2.    Plaintiff's motion and amended motion to extend the deadline to file her brief in opposition to the defendant's motion for summary judgment ([Filing No. 108](#) and [Filing No. 110](#)) are denied as moot.

3.    Defendant's motion to withdraw ([Filing No. 115](#)) its motion to strike the plaintiff's brief ([Filing No. 109](#)) is granted.

Dated this 20th day of December, 2017.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge